UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 26-61372-jwc |
| **1847 Meadow LLC,** | : | CHAPTER 7 |
| Debtor. | : | |
| **Select Portfolio Servicing Inc., as Servicing agent for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust**, | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| **1847 Meadow LLC, Debtor.** | : | |
| **Jason L. Pettie, Trustee.** | : | |
| Respondents. | : | |

**NOTICE OF HEARING**

**PLEASE TAKE NOTICE** that ***Select Portfolio Servicing Inc., as Servicing agent for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust ("Movant")*** has filed a ***Motion for Relief from Stay (the "Motion")*** and related papers with the Court seeking an order ***granting relief from the automatic stay***.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the ***Motion*** at ***10:00 A. M***. on ***November 5, 2026*** in Courtroom ***1203***, United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303, which must be attended in person unless otherwise ordered by the Court.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not

want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk before the hearing. The address of the Clerk's Office is: Clerk, U. S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, SW, Atlanta Georgia 30303. You must also mail a copy of your response to the undersigned at the address stated below.

***If a hearing on the Motion cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the Motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.***

Dated: 10/05/2026

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 26-61372-jwc |
| **1847 Meadow LLC,** | : | CHAPTER 7 |
| Debtor. | : | |
| **Select Portfolio Servicing Inc., as Servicing agent for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust**, | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| **1847 Meadow LLC, Debtor. Jason L. Pettie, Trustee.** | | |
| Respondents. | : | |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**

COMES NOW, Select Portfolio Servicing Inc., as Servicing agent for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust, (hereinafter referred to as "Movant"), by and through its undersigned counsel, moves for relief from the automatic stay and alleges as follows:

1.

The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 362, FRBP 4001(a), and the various other applicable provisions of the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the laws of the United States of

America.

2.

1847 Meadow LLC, (hereinafter referred to as "Debtor", filed a petition for relief under Chapter 7 of the Bankruptcy Code on August 26, 2026.

3.

Movant is the holder or servicer of a loan secured by certain real property in which the Debtor has an interest. Movant holds a security interest in the Debtor's real property now or formerly known as **1847 Meadow Lane, Decatur Georgia 30032** (hereinafter referred to as "Property") by virtue of a Security Deed dated July 06, 2023. Said Security Deed secures a Note in the original principal amount of $360,000.00. The promissory note has been duly endorsed. Select Portfolio Servicing, Inc. is the servicer of the loan described in the Note and Mortgage and, as such, has the authority to initiate the instant action and any foreclosure on the Creditor's behalf.

4.

Movant alleges that the Debtor is in default to Movant under the terms of the loan documents, having failed to make certain mortgage payments that have come due. As of September 10, 2026, the arrearage owed to Movant is $46,264.60 An additional payment will come due October 1, 2026 and on the first day of each month thereafter until the loan is paid in full.

5.

Movant further alleges there appears to be no equity in the Property; therefore, the Property is not necessary for effective reorganization. The current unpaid principal balance due under the loan documents is approximately $354,538.22. The Property is most recently valued at $158,000.00 by the Dekalb County Tax Assessor's Office.

6.

Movant's security interest in the Property is not adequately protected due to the Debtor's failure to maintain the mortgage payments.

7.

Movant has incurred attorney's fees and costs as a result of filing this motion. These fees and costs are recoverable pursuant to the loan documents, and Movant seeks leave to recover these fees and costs under the remedies available therein.

8.

Pursuant to 11 U.S.C. § 362, Movant alleges that sufficient cause, including lack of adequate protection, exists for the automatic stay to be terminated.

WHEREFORE, Movant respectfully prays to the Court as follows:

(a) That the automatic stay under 11 U.S.C. § 362 be modified to allow Movant to pursue state remedies to protect its security interest in the Property, including, but not limited to, advertising to effectuate a foreclosure sale and gaining possession of the Property; to contact the Debtor via telephone or written correspondence to discuss potential loan workout or loss mitigation opportunities; and to perform property preservation as appropriate;

(b) That Movant's attorney's fees and costs incurred in filing and prosecuting this Motion be recoverable as pursuant to the loan documents and remedies available therein;

(c) That the fourteen (14) day stay of Bankruptcy Rule 4001(a)(4) be

waived;

(d) That Movant be permitted to offer and provide Debtor with information regarding a potential forbearance agreement, loan modification, refinance agreement, or other loan workout/loss mitigation agreement, and to enter into such an agreement with Debtor.

(e) For such other and further relief the Court deems just and proper.

Date: 10/05/2026

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith_
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 26-61372-jwc |
| | : | |
| **1847 Meadow LLC,** | : | CHAPTER 7 |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| **Select Portfolio Servicing Inc., as Servicing agent for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust**, | : | |
| | : | |
| Movant, | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| **1847 Meadow LLC,** **Debtor.** **Jason L. Pettie,** **Trustee.** | | |
| | : | |
| Respondents. | : | |
| | : | |

**<u>Certificate of Service</u>**

I hereby certify that on the ***5th*** day of ***October 2026*** I electronically filed the foregoing ***Motion for Relief from Stay and Notice of Hearing*** using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

***Jason L. Pettie***

I further certify that on this day I caused a copy of this document to be served via ***United States First Class Mail,*** on the following parties at the address shown for each.

***1847 Meadow LLC***
***3781 Covington Hwy***
***Decatur, GA 30032***

***U.S. Trustee***
***Office of the United States Trustee***
***362 Richard Russell Building***
***75 Ted Turner Drive, SW***
***Atlanta, GA 30303***

Dated: 10/05/2026

**Robertson, Anschutz, Schneid, Crane & Partners, PLLC**

/s/ Willie B. Smith_
Willie Bruce Smith
Georgia Bar # 507412
13010 Morris Rd.,Suite 450
Alpharetta, GA 30004
Telsephone: 470-321-7112
Fax: 404-393-1425
Email: wismith@raslg.com

# SUPPORTING DOCUMENTS

[redacted]

Loa[redacted]

# NOTE

July 6, 2023 [Note Date] — Atlanta [City] — GEORGIA [State]

1847 Meadow Lane, Decatur, Georgia 30032

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan in the amount of U.S. $ 360,000.00 (the "Principal") that I have received from UNITED WHOLESALE MORTGAGE, LLC (the "Lender"), I promise to pay the Principal, plus interest, to the order of the Lender. I will make all payments under this Note in U.S. currency in the form of cash, check, money order, or other payment method accepted by Lender.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of the Principal has been paid. I will pay interest at a yearly rate of 8.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month. This amount is called my "Monthly Payment."

I will make my Monthly Payment on the 1st day of each month beginning on September 1, 2023. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each Monthly Payment will be applied as of its scheduled due date and will be applied to interest before the Principal. If, on August 1, 2053, I still owe amounts under this Note, I will pay those amounts on that date, which is called the "Maturity Date."

I will make my Monthly Payments at PO Box 11733, Newark, New Jersey 07101 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My Monthly Payment will be in the amount of U.S. $ 2,768.09. This payment amount does not include any property taxes, insurance, or other charges that I may be required to pay each month.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will notify the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the Monthly Payments then due under this Note.



[redacted]

[redacted]

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my Monthly Payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If applicable law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any Monthly Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue Monthly Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each Monthly Payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of unpaid Principal, all the interest that I owe on that amount, and other charges due under this Note (the "Default Balance"). That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

If I am in default and the Note Holder does not require me to pay the Default Balance immediately as described above, the Note Holder will still have the right to do so if I continue to be in default or if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay the Default Balance immediately as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees and costs.

## 7. GIVING OF NOTICES

**(A) Notice to Borrower**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it, or by mailing it by first class mail, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. I will promptly notify the Note Holder of any change to my physical address and of any change to my mailing address. Unless applicable law requires otherwise, notice may instead be sent by e-mail or other electronic communication if agreed to by me and the Note Holder in writing and if I have provided the Note Holder with my current e-mail address or other electronic address. If I have agreed with the Note Holder that notice may be given by e-mail or other electronic communication, I will promptly notify the Note Holder of any changes to my e-mail address or other electronic address.



[redacted]

**(B) Notice to Note Holder**

Any notice that I must give to the Note Holder under this Note will be delivered by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument also describes how and under what conditions I may be required to make immediate payment of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.



[redacted]

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________________________(Seal)
Terrance Beasley -Borrower

Loan Originator: Robert John Knapp, NMLSR ID [redacted]
Loan Originator Organization: Your Best Interest Financial
Services LLC, NMLSR ID [redacted]
Loan Origi[redacted]on: UNITED WHOLESALE MORTGAGE, LLC,
NMLSR ID [redacted]

*[Sign Original Only]*



[redacted]

PAY TO THE ORDER OF

______________________________

WITHOUT RECOURSE
UNITED WHOLESALE MORTGAGE, LLC

______________________________

MARIA SUBASHI
VP POST-CLOSING OPERATIONS

2023079056 DEED BOOK 30994 Pg 795
Filed and Recorded: 7/12/2023 9:24:00 AM
Recording Fee: $25.00
Intangible Tax: $1,080.00
Prepared By:
[redacted]

*Please return when recorded to:*
*Girardot & LaRose., P.C.*
*4 Lenox Pointe NE Ste B*
[redacted]

[redacted]

---

**DEED COVER PAGE SECURITY DEED**

DATE OF DOCUMENT: : July 6, 2023

NAME/S OF SIGNATORIES: Terrance Beasley

GRANTEE/LENDER MAILING ADDRESS: P. O. Box 202028, Florence, SC 29502

MAP AND PARCEL IDENTIFICATION: [redacted]

ORIGINAL LOAN AMOUNT: $360,000.00

MATURITY DATE FOR SUCH DEBT: AUGUST 1, 2053

INTANGIBLE RECORDING TAX AMOUNT, IF ANY,
IMPOSED ON SUCH DEED TO SECURE DEBT: 1,080.00

CITATION TO AUTHORITY PROVIDING FOR
AN EXEMPTION OF SUCH TAX IF NO INTANGIBLE
TAX IS IMPOSED:

After Recording Return To:
UNITED WHOLESALE MORTGAGE, LLC
585 SOUTH BOULEVARD E
PONTIAC, MI 48341
[redacted]GER

[Space Above This Line For Recording Data]

[redacted]

# SECURITY DEED

**Date of Document:** July 6, 2023

**Name(s) of Signatories:** Terrance Beasley

**Grantee(s) and Mailing Address:** MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC (MERS) P.O. Box 2026, Flint, MI 48501-2026

**Map and Parcel Identification Information (if applicable):** 15-168-01-031

**Original loan amount (or amount of any outstanding principal and additional advance pursuant to a loan modification):** $ 360,000.00

**Maturity Date:** August 1, 2053

**Intangible Recording Tax Amount:** $ N/A
Exempt from intangible recording tax pursuant to Ga. Comp. R, & Regs. 560-1-8-05.



DocMagic
[redacted]

[redacted]

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

### Parties

**(A) "Borrower"** is Terrance Beasley

currently residing at 2475 Hillside Drive, DECATUR, GEORGIA 30032

Borrower is the grantor under this Security Instrument.

**(B) "Lender"** is United Wholesale Mortgage, LLC

Lender is a LIMITED LIABILITY COMPANY organized and existing under the laws of MICHIGAN. Lender's address is 585 South Boulevard E, Pontiac, Michigan 48341

The term "Lender" includes any successors and assigns of Lender.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

### Documents

**(D) "Note"** means the promissory note dated July 6, 2023, and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender THREE HUNDRED SIXTY THOUSAND AND 00/100 Dollars (U.S. $ 360,000.00) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than August 1, 2053.

**(E) "Riders"** means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

- ☐ Adjustable Rate Rider
- ☒ 1-4 Family Rider
- ☐ Second Home Rider
- ☐ Condominium Rider
- ☐ Planned Unit Development Rider
- ☒ Other(s) [specify]: Acknowledgment Rights Rider


DocMagic [redacted]

[redacted]

(F) **"Security Instrument"** means this document, which is dated July 6, 2023 , together with all Riders to this document.

**Additional Definitions**

(G) **"Applicable Law"** means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(H) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.
(I) **"Default"** means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).
(J) **"Electronic Fund Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.
(K) **"Electronic Signature"** means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.
(L) **"E-SIGN"** means the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.
(M) **"Escrow Items"** means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.
(N) **"Loan"** means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(O) **"Loan Servicer"** means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.
(P) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(Q) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or Default on, the Loan.
(R) **"Partial Payment"** means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.
(S) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.



[redacted]

**(T) "Property"** means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."
**(U) "Rents"** means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.
**(V) "RESPA"** means the Real Estáte Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(W) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.
**(X) "UETA"** means the Uniform Electronic Transactions Act, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of DEKALB :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

See Attached
[redacted]

which currently has the address of 1847 Meadow Lane
[Street]
Decatur , Georgia 30032 ("Property Address");
[City] [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom,



[redacted]

MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Georgia state requirements to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to



[redacted]

principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

(c) **Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

(d) **No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.**

(a) **Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the "Funds"). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

(b) **Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

(c) **Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

(d) **Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.



[redacted]

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the "Required Actions"). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.



[redacted]

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds



[redacted]

for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. Borrower will not surrender the leasehold estate and interests conveyed, or terminate or cancel the ground lease. Borrower will not, without the express written consent of Lender, alter or amend the ground lease.



[redacted]

If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

**10. Assignment of Rents.**

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("Tenant"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

**(c) Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

**(d) Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

**(e) No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

**(f) Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

**(g) Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

**(a) Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage



[redacted]

Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter ("HPA"). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person



[redacted]

[redacted]

repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(c) **Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a "Partial Devaluation") where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

(d) **Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. "Opposing Party" means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

(e) **Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors



[redacted]

in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights or exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice



[redacted]

to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication ("Electronic Communication") if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address ("Electronic Address"); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice ("Notice Address") will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Georgia. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to "Section" in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those

beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take



[redacted]

corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

(a) **Definitions.** As used in this Section 24: (i) "Environmental Law" means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) "Hazardous Substances" include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

(b) **Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

(c) **Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("Borrower's Electronic Signature") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

(a) **Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right under Section



DocMagic [redacted]

[redacted]

19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument.

**(c) Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender will give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

**(d) Conveyance of Property; Proceeds of Sale; Surrender of Possession.** Lender will convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender as Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed will be prima facie evidence of the truth of the statements made in that deed. Borrower covenants and agrees that Lender apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 26, Borrower, or any person holding possession of the Property through Borrower, will immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person will be a tenant holding over and may be dispossessed in accordance with Applicable Law.

**27. Release.** Upon payment of all sums secured by this Security Instrument, Lender will cancel this Security Instrument. Borrower will pay any recordation costs associated with such release. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**28. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property. This provision does not prevent Borrower from filing a property tax homestead exemption.

**29. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection with such assumption, will not constitute a novation.

**30. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured by this Security Instrument.



[redacted]

[redacted]

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

M. Moore
Unofficial Witness

_______________ (Seal)
Terrance Beasley -Borrower

_______________
Public Notary

My Commission expires: 2-6-25

WILLIAM E BRUMBY II
MY COMMISSION EXPIRES
NOTARY
PUBLIC
FEBRUARY 06, 2025
COBB COUNTY, GEORGIA

[NOTARY SEAL]

Notary Public, Cobb County

[redacted]



DocMagic [redacted]

[redacted]

EXHIBIT "A"

All that tract or parcel of land lying and being in Land Lot 168 of the 15th District, DeKalb County, Georgia, being Lot 31, Glenmeadows Subdivision, according to plat recorded in Plat Book 18, Page 4, DeKalb County, Georgia records, which plat is hereby referred to and made a part of this description.

Property being known as 1847 Meadow Lane, Decatur, GA 30032

Tax Parcel No. [redacted]

[redacted] [redacted]

# 1-4 FAMILY RIDER

THIS 1-4 FAMILY RIDER is made this 6th day of July, 2023, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to UNITED WHOLESALE MORTGAGE, LLC (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1847 Meadow Lane, Decatur, Georgia 30032

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or later attached to the Property, to the extent they are fixtures, are added to the Property description, and will also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or later located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, and attached floor coverings, all of which, including replacements and additions, will be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower will not seek, agree to, or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower will comply with all laws, ordinances, regulations, and requirements of any governmental body applicable to the Property.

**C. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**D. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower will assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender will have the right to modify, extend, or terminate the existing leases and to execute new leases, in Lender's sole



[redacted]

[redacted]

discretion. As used in this paragraph D the word "lease" will mean "sublease" if the Security Instrument is on a leasehold.

**E. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement related to the Property in which Lender has an interest will be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____________________________(Seal)
Terrance Beasley -Borrower

 DocMagic [redacted]

[redacted]

Loan Numb[redacted]

# ACKNOWLEDGMENT OF BORROWER'S RIGHTS RIDER

THIS ACKNOWLEDGMENT OF BORROWER'S RIGHTS RIDER is made this 6th day of July, 2023 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to
UNITED WHOLESALE MORTGAGE, LLC

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1847 Meadow Lane, Decatur, Georgia 30032

[Property Address]

**In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree to the following:**

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THE SECURITY DEED; (2) ACKNOWLEDGES THAT GRANTOR HAS READ THE SECURITY DEED AND THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID SECURITY DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THE SECURITY DEED; AND (3) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.



[redacted]

READ AND AGREED BY GRANTOR:

[Space Below This Line For Acknowledgment]

Signed, sealed and delivered on this 6th day of July, 2023 in the presence of:

M. Moore
Unofficial Witness

William E Brumby II
Notary Public, State of Georgia

Printed Name: William E. Brumby II

My commission expires: 2.6.25

WILLIAM E BRUMBY II
MY COMMISSION EXPIRES
NOTARY
PUBLIC
FEBRUARY 06, 2025
COBB COUNTY, GEORGIA

(Seal)
Terrance Beasley -Borrower



[redacted]

[redacted]

2023079056 DEED BOOK 30994 Pg 819
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Security Deed by the Borrower(s), I or a representative of the firm reviewed with and explained to the Borrower(s) the terms and provisions of the Security Deed and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale. After said review with and explanation to Borrower(s), Borrower(s) executed the Security Deed and "Acknowledgment of Borrower's Rights."

Sworn and subscribed before me this 6th day of July, 2023.

Mary M. Moore
Notary Public

MARY M MOORE
MY COMMISSION EXPIRES
NOTARY PUBLIC
MAY 30, 2024
DEKALB COUNTY, GEORGIA

William [signature] II.
Closing Attorney



DocMagic [redacted]

[redacted]

**2025073344 DEED BOOK 32059 PG 390**
**Filed and Recorded: 6/27/2025 8:50:00 AM**
**Recording Fee: $25.00**
**Intangible Tax: $0.00**
**Debra DeBerry**
**Clerk of Superior Court**
**DeKalb County, Georgia**

*Please return when recorded to:*
*Girardot & LaRose., P.C.*
*4 Lenox Pointe NE Ste B*
[redacted]*4*

**SECOND PRIORITY DEED TO SECURE DEBT COVER PAGE**
**SHORT TERM BALLOON**

DATE OF DOCUMENT: May 14, 2025

NAME/S OF SIGNATORIES: 1847 Meadow LLC, Terrance Beasley, Manager

GRANTEE/LENDER MAILING ADDRESS: PO Box 684431, Marietta, GA 30068

MAP AND PARCEL IDENTIFICATION: [redacted]

ORIGINAL LOAN AMOUNT: $50,300.00

MATURITY DATE FOR SUCH DEBT: May 14, 2026

INTANGIBLE RECORDING TAX AMOUNT, IF ANY,
IMPOSED ON SUCH DEED TO SECURE DEBT: $0.00

CITATION TO AUTHORITY PROVIDING FOR
AN EXEMPTION OF SUCH TAX IF NO INTANGIBLE
TAX IS IMPOSED: Short-term note per OCGA 48-6-60(4)

STATE OF GEORGIA, COUNTY OF FULTON

## SECOND PRIORITY DEED TO SECURE DEBT
## SHORT TERM BALLOON

THIS INDENTURE, made this **May 14, 2025** by and between **1847 Meadow LLC** (hereinafter called the "Grantor") and **WINSTON HOLDINGS, LLC** including its successors and assigns, whose address is **PO Box 684431, Marietta, GA 30068** (hereinafter called the "Grantee"),

WITNESSETH:

That for and in consideration of the sum of ONE HUNDRED AND NO/100 ($100.00) DOLLARS in hand paid and the other considerations hereinafter mentioned, receipt whereof is hereby acknowledged, the Grantor does hereby bargain, sell, grant and convey to the Grantee, its successors and assigns, all of the following described land, buildings, improvements (including improvements to be made hereafter), fixtures, furniture and appliances and other personal property (hereinafter sometimes collectively called the "premises" or the "property"), to wit:

**Subject Property commonly known as 1847 Meadow Lane, Decatur, GA (DeKalb Co.) 30032, and being more particularly described in EXHIBIT "A" attached hereto and made a part hereof by reference,**

TOGETHER WITH all rights, title and interest of Grantor in and to the minerals, crops, timber and emblements now or hereafter located on the premises;

TOGETHER WITH all gas and electric fixtures, radiators, heaters, space heaters, engines and machinery, boilers, ranges, ovens, elevators, motors, bathtubs, sinks, water closets, basins, pipes, faucets and other air conditioning, plumbing and heating fixtures, drapes, mirrors, mantles, refrigerating plants, refrigerators, iceboxes, dishwashers, carpeting, furniture, furnishings, appliances, fixtures, laundry equipment, cooking apparatus and appurtenances, and all building material and equipment now or hereafter delivered to the premises and intended to be installed therein; goods, equipment, chattels and personal property of every kind and nature whatsoever; together with all renewals or replacements thereof or articles in substitution therefore and all of the estate, right, title and interest of the Grantor in and to all property of any nature whatsoever, now or hereafter situated on the premises or intended to be used in connection with the operation thereof, all of which shall be deemed to be fixtures and an accession to the freehold and a part of the realty as between the parties hereto and all persons claiming by, through or under them and shall be deemed to be a portion of the security for the indebtedness herein mentioned and secured by this deed;

TOGETHER WITH all and singular the rights, members and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the premises hereinabove mentioned or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Grantor, including but not limited to all rents, profits, issues and revenues of the premises from time to time accruing, whether under leases or tenancies now existing or hereafter, created, reserving only the right to the Grantor to collect the same so long as the Grantor is not in default hereunder and so long as the same are not subjected to garnishment, levy, attachment or lien. In addition, Grantor hereby assigns, transfers and conveys to Grantee all Grantor's rights, title and interest in, to and under all leases now or hereafter leasing or affecting the premises or any part thereof;

TO HAVE AND TO HOLD the premises and all parts, rights, members and appurtenances thereof, to the use, benefit and behoof of the Grantee, its successors and assigns, in fee simple forever; and the Grantor covenants that Grantor is lawfully seized and possessed of the premises in fee simple and has good right to convey the same, that the same are unencumbered and that the Grantor will warrant and defend the title thereto against the claims of all persons whomsoever, except as hereinafter expressly provided.

This conveyance is intended (i) to constitute a security agreement as required under the Uniform Commercial Code of Georgia and (ii) to operate and is to be construed as a deed passing the title to the premises to the Grantee and is made under those provisions of the existing laws of the State of Georgia relating to Deeds to Secure Debt, and not as a mortgage, and is given to secure (a) a debt evidenced by a promissory note (hereinafter called the "Note" which is incorporated herein by reference) of same date herewith executed by the Grantor herein, payable to the order of Grantee in the principal sum of **Fifty Thousand Three Hundred and 00/100 Dollars ($50,300.00)** U.S. with interest payable on the amounts from time to time disbursed at the rate and in the manner therein specified with a final payment of principal and accrued unpaid interest being **due on May 14, 2026**; (b) any and all renewals and extensions of the Note, either in whole or in part, whether at the same, a higher or a lower rate of interest than is payable under the Note as originally executed; (c) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Grantee, however incurred, and all renewals and extensions thereof including, without limiting the generality of the foregoing, any and all future advances made by Grantee to or on behalf of or for the account of Grantor; and (d) any consolidation of the Note and such other indebtedness.

The Grantor covenants with the Grantee as follows:

ARTICLE I

1.01 Payment of Indebtedness. The Grantor will pay the Note according to the tenor thereof and all other sums secured hereby promptly as the same shall become due.

1.02 Monthly Deposits. To secure further the payment of the taxes and assessments hereinafter referred to and the premiums on the insurance hereinafter referred to, and upon the request of Grantee, Grantor will deposit with Grantee on the first day of each and every month a sum which, in the estimation of Grantee, shall be equal to one-twelfth of the annual taxes, assessments and insurance premiums; said deposits to be held by Grantee, free of interest, and free of any liens or claims on the part of creditors of Grantor and as part of the security of Grantee, and to be used by Grantee to pay current taxes and assessments and insurance premiums on the premises as the same accrue and are payable. Said deposits shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of Grantee. If said deposits are insufficient to pay the taxes and assessments and insurance premiums in full as the same become payable, Grantor will deposit with Grantee such additional sum or sums as may be required in order for Grantee to pay such taxes and assessments and insurance premiums in full. Upon any default hereunder or under the Note, Grantee may, at its option, apply any money in the fund resulting from said deposits to the payment of the indebtedness secured hereby in such manner as it may elect.

1.03 Taxes, Liens and Other Charges.

(a) In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of debts secured by deeds to secure debt or in the manner of collecting taxes so as to affect adversely the Grantee, the Grantor will promptly pay any such tax; if the Grantor fails to make such prompt payment or if any such state, federal, municipal or other governmental law, order, rule or regulation prohibits Grantor from making such payment or would penalize Grantee if Grantor makes such payment, then the entire balance of the principal sum secured by this indenture and all interest accrued thereon shall, without notice, immediately become due and payable at the option of the Grantee.

(b) The Grantor will pay, before the same become delinquent, all taxes, liens, assessments and charges of every character already levied or assessed or that may hereafter be levied or assessed upon or against said premises and all utility charges, whether public or private; and upon demand will furnish the Grantee receipted bills evidencing such payment.

(c) The Grantor will not suffer any mechanic's, materialmen's, laborer's, statutory or other lien to be created or to remain outstanding upon any part of the premises.

1.04 Insurance. The Grantor will keep all buildings and improvements whether now standing on said premises or hereafter erected, continuously insured against loss or damage by fire, by the perils covered by extended coverage insurance, by builders risk insurance, by loss of rents or business interruption insurance and by malicious mischief insurance and against such other hazards as the Grantee in its sole discretion shall from time to time require for the benefit of the Grantee; all such insurance at all times will be in any insurance company or companies and in terms acceptable to the Grantee, with loss, if any, payable to the Grantee as its interest may appear, pursuant to a non-contributory mortgagee clause which shall be satisfactory to the Grantee; and forthwith upon the issuance of such policies the Grantor will deliver to the Grantee receipts for the premiums paid thereon. Any policies furnished to Grantee shall become its property in the event Grantee becomes owner of said premises by foreclosure or otherwise. The Grantee is hereby authorized and empowered, at its option, to adjust or compromise any loss under any insurance policies on the premises, and to collect and receive the proceeds from any such policy or policies. Each insurance company is hereby authorized and directed to make payment for all such losses directly to the Grantee, instead of to the Grantor and Grantee jointly. In case of loss under any such policy of insurance, the Grantee may apply the net proceeds to the payment of the indebtedness hereby secured, whether due or not, or the Grantee may require all buildings and improvements to be repaired or replaced by the use of said net proceeds.

1.05 Care of Premises.

(a) The Grantor will keep the improvements now or hereafter erected on the premises in good condition and repair, will not commit or suffer any waste and will not do or suffer to be done anything which will increase the risk of fire or other hazard to the premises or any part thereof.

(b) The Grantor will not, without the written consent of the Grantee, remove nor demolish nor alter the design or structural character of any building (now or hereafter erected), fixture, chattel or other part of the premises.

(c) If the premises or any part thereof is damaged by fire or any other cause, the Grantor will give immediate written notice of the same to Grantee.

(d) The Grantee or its representative is hereby authorized to enter upon and inspect the premises at any time during normal business hours.

(e) The Grantor will promptly comply with all restrictive covenants, present, and future laws, ordinances, rules and regulations of any governmental authority affecting the premises or any part thereof.

(f) If all or any part of the premises shall be damaged by fire or other casualty, the Grantor will, upon request of Grantee, promptly restore the premises to the equivalent of its condition immediately prior to such damage, and if a part of the premises shall be damaged through condemnation, the Grantor will, upon request of Grantee, promptly restore, repair or alter the remaining property in a manner satisfactory to the Grantee. In the event Grantor is required to restore, repair or alter the premises hereunder after fire, other casualty or condemnation, Grantor shall be entitled to any net insurance proceeds or condemnation proceeds which have been received as a result of said fire, other casualty or condemnation so to restore, repair or alter, but only to the extent of the cost of such restoration, repair or alteration.

1.06 Further Assurances. At any time, and from time to time, upon request by the Grantee, the Grantor will, at the expense of Grantor, make, execute and deliver or cause to be made, executed and delivered, to the Grantee, any and all other further instruments, certificates and other documents as may, in the opinion of the Grantee, be necessary or desirable in order to affirm, effectuate, complete, or perfect or to continue and preserve the obligations of the maker of the Note and the security interest of this Deed to Secure Debt and Security Agreement. Upon any failure by the Grantor so to do, the Grantee may make, execute and record any and all such instruments, certificates and documents for and in the name of the Grantor and the Grantor hereby irrevocably appoints the Grantee the agent and attorney in fact of the Grantor so to do.

1.07 Expenses. The Grantor shall (a) pay or reimburse the Grantee for all reasonable attorney's fees, costs and expenses incurred by the Grantee in any proceedings involving the estate of a decedent, an insolvent or a bankrupt, or in any action, legal proceeding or dispute of any kind in which the Grantee is made a party, or appears as party plaintiff or defendant, affecting the indebtedness secured hereby, this deed, the interest created herein, the premises or the exercise or enforcement of Grantee's rights under this deed including but not limited to the exercise of the power of sale of this deed, any condemnation action involving the premises or any action to protect the security hereof, and (b) indemnify and hold Grantee harmless from all losses and damages incurred by the Grantee in any such proceedings, action or dispute; and any such fees, costs, expenses, losses or damages incurred by Grantee shall be added to the indebtedness secured by this deed.

1.08 Estoppel Affidavits. The Grantor, upon ten (10) days' prior written notice, shall furnish the Grantee a written statement duly acknowledged, setting forth the unpaid principal of, and interest on, the indebtedness secured hereby and whether or not any off-sets or defenses exist against such principal and interest.

1.09 Subrogation. The Grantee shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the indebtedness secured hereby.

1.10 Performance by Grantee of Defaults by Grantor. If the Grantor shall default in the payment of any tax, lien, assessment or charge levied or assessed against the premises, in the payment of any utility charge, whether public or private, in the payment of insurance premiums, in the procurement of insurance coverage and the delivery of the insurance policies required hereunder, or in the performance or observance of any other covenant, condition or term of this Deed to Secure Debt and Security Agreement, then the Grantee, at its option, may perform or observe the same, and all payments made or costs incurred by the Grantee in connection therewith, shall be secured hereby and shall be, without demand, immediately repaid by the Grantor to the Grantee with interest thereon at the rate of Twenty (20%) percent per annum. The Grantee shall be the sole judge of the legality, validity and priority of any such tax, lien, assessment, charge, claim and premium, of the necessity for any such actions and of the amount necessary to be paid in satisfaction thereof. The Grantee is hereby empowered to enter and to authorize others to enter upon the premises or any part thereof for the purpose of performing or observing any such defaulted covenant, condition or term, without thereby becoming liable to the Grantor or any other person in possession holding under the Grantor.

1.11 Condemnation. If all or any part of the premises shall be damaged or taken through condemnation (which term when used in this indenture shall include any damage or taking by any governmental authority and any transfer by private sale in lieu thereof), either temporarily or permanently, the entire indebtedness secured hereby shall, at the option of the Grantee, become immediately due and payable. The Grantee shall be entitled to all compensation, awards, and other payments or relief thereof and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or the Grantor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by the Grantor to the Grantee, who, after deducting therefrom all its expenses, including attorney's fees, may release any monies so received by

it without affecting the security interest of this deed and may apply the same in such manner as the Grantee shall determine to the reduction of the indebtedness secured hereby, to any prepayment fee herein or in the Note provided and any balance of such monies then remaining shall be paid to the Grantor. The Grantor agrees to execute such further assignment of any compensation, awards, damages, claims, rights of action and proceeds as the Grantee may require.

ARTICLE II

2.01 Event of Default. An event of default shall have occurred under this Indenture if:

(a) The Grantor fails to pay when due and payable any installment of principal, interest and late charges in accordance with the terms of the Note, this Deed to Secure Debt and Security Agreement and all other instruments evidencing and securing the indebtedness secured hereby; or

(b) Grantor fails duly to observe any other covenant, condition or agreement of this Deed to Secure Debt and Security Agreement or of any other instruments evidencing, securing or executed in connection with the indebtedness secured hereby (hereinafter this Deed to Secure Debt and Security Agreement and said other instrument are sometimes collectively called the "Loan Documents"); or

(c) Any warranties or representations made or agreed to be made in any of the Loan Documents shall be breached by the Grantor or shall prove to be false or misleading; or

(d) Any lien for labor or materials or otherwise shall be filed against the premises; or

(e) A levy shall be made under any process on, or a receiver be appointed for, the premises or any other property of Grantor; or

(f) Grantor or any guarantor of the Note shall commit any act of bankruptcy; or

(g) Grantor or any guarantor of the Note shall file a voluntary petition in bankruptcy, or any other petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation or similar relief for Grantor or any guarantor of the Note under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or

(h) Grantor or any guarantor of the Note shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Grantor or any guarantor of the Note or of all or any part of the premises or of any or all of the rents, revenues, issues, earnings, profits or income thereof; or

(I) Grantor or any guarantor of the Note shall make any general assignment for the benefit of creditors; or

(j) In any legal proceeding the Grantor or any guarantor of the Note shall be alleged to be insolvent or unable to pay the Grantor's debts or any of guarantor's debts, respectively, as they become due; or

(k) Grantor, if a corporation or a partnership, commences the process of dissolution, liquidation, or both dissolution and liquidation; or

(l) Grantor shall do, or shall omit to do, any act, or any event shall occur, as a result of which any indebtedness of the Grantor, not arising hereunder, may be declared immediately due and payable by the holder thereof and such declaration would materially affect the ability of Grantor to perform each and every one of Grantor's obligations under the Loan Documents; or

(m) Grantor shall, without the written consent of the Grantee, voluntarily or by operation of law, sell, transfer, convey or assign all or any part of the legal or equitable title to the premises, or any part of, or interest in, the premises, or any of the personalty located thereon or used or intended to be used in connection therewith; this paragraph, 2.01 (m), shall not be applicable if the premises is real property subject to O.C.G.A. section 44-14-5; or

(n) Grantor shall, without the prior written consent of the Grantee, transfer, convey, or assign the premises, or any part of, or interest in, the premises as security for an indebtedness other than for the indebtedness secured hereby; or

(o) Any guarantor of the Note shall die, or, in the event Grantor is an individual or group of individuals or a partnership, Grantor or any one or more of the individuals constituting Grantor or any one or more of the partners of Grantor shall die.

For the purposes of this paragraph, 2.01, the term "guarantor" shall include any maker or endorser of or any surety for the Note.

2.02 Acceleration of Maturity.. If an event of default shall have occurred, then the whole unpaid principal sum of the indebtedness secured hereby with interest accrued thereon shall, at the option of the Grantee, become due and payable without notice or demand, time being of the essence of this indenture; and no omission on the part of the Grantee to exercise such option when entitled so to do shall be considered as a waiver of such right.

2.03 Right of Grantee to Enter and Take Possession.

(a) If any event of default shall have occurred and be continuing, the Grantor, upon demand of the Grantee, shall forthwith surrender to the Grantee the actual possession of the premises and if, and to the extent, permitted by law, the Grantee may enter and take possession of the premises and may exclude the Grantor and the Grantor's agent and employees wholly therefrom.

(b) Upon every such entering and taking of possession, the Grantee may hold, store, use, operate, manage, control, and maintain the premises and conduct the business thereof, and, from time to time, (I) make all necessary and proper repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other property, (ii) insure or keep the premises insured, (iii) manage and operate the premises and exercise all the rights and powers of the Grantor in its name or otherwise, with respect to the same, and (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted the Grantee, all as the Grantee may from time to time determine to be to its best advantage; and the Grantee may collect and receive all of the income, rents, profits,

issues and revenue of the premises, including those past due as well as those accruing thereafter and, after deducting (aa) all expenses of taking, holding, managing and operating the premises (including compensation for the services of all persons employed for such purposes); (bb) the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases, and acquisitions; (cc) the cost of such insurance; (dd) such taxes, assessments and other charges prior to the lien of this indenture as the Grantee may determine to pay, (ee) other proper charges upon the premises or any part thereof, and (ff) the reasonable compensation and expenses of attorneys and agents of the Grantee, shall apply the remainder of the money so received by the Grantee, first to the payment of accrued interest and late charges, and finally to the payment of overdue installments of principal.

(c) For the purpose of carrying out the provisions of this paragraph 2.03, the Grantor hereby constitutes and appoints the Grantee the true and lawful attorney in fact of the Grantor to do and perform, from time to time, any and all actions necessary and incidental to such purpose and does, by these presents, ratify and confirm any and all actions of said attorney in fact in the premises.

(d) Whenever all such events of default have been cured and satisfied, the Grantee shall surrender possession of the premises to the Grantor, provided that the right of the Grantee to take possession, from time to time, pursuant to subparagraph 2.03(a) shall exist if any subsequent event of default shall occur and be continuing.

2.04 Appointment of a Receiver; Collection of Rents, Issues, Profits and Revenues.

(a) If an event of default shall have occurred and be continuing, the Grantee, upon application to a court of competent jurisdiction, shall be entitled, without notice and without regard to the adequacy of any security for the indebtedness hereby secured or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the premises and to collect the rents, profits, issues, and revenues thereof; all such rents, issues, profits and revenues so collected by such receiver shall be deemed to be collected and held by such receiver for the benefit of Grantee and shall be applied in the manner provided in paragraph 2.03(b).

(b) The Grantor will pay to the Grantee upon demand all expenses, including receiver's fee, attorney's fees, costs and agent's compensation, incurred pursuant to the provisions contained in this paragraph 2.04; and all such expenses shall be secured by this indenture.

(c) In the event that the rents, issues, profits and revenues of the premises are collected by a receiver (whether appointed pursuant to the provisions of paragraph 2.04(a) or otherwise), a trustee or a debtor in possession pursuant to bankruptcy, arrangement, reorganization or insolvency proceedings, all such rents, issues, profits and revenues so collected shall be deemed to be collected and held by such receiver, trustee or debtor in possession for the benefit of Grantee and shall be applied in the manner provided in paragraph 2.03(b).

2.05 Power of Sale. When the indebtedness secured hereby shall become due, whether by acceleration or otherwise, the Grantor grants to Grantee and assigns, the following irrevocable power of attorney, Grantee, at its option, to sell the premises or any part of the premises at public auction sale or sales at the usual place for conducting public sales at the courthouse of the County in which the premises or any part of the premises is situated, to the highest bidder for cash, in order to pay the indebtedness secured hereby and accrued interest thereon and insurance premiums, liens, assessments, taxes and charges, including utility charges, if any, with accrued interest thereon and all expenses of the sale and of all proceedings in connection therewith, including 15% of the principal and interest as attorney's fees, after advertising the time, place and terms of sale once a week for four (4) weeks immediately preceding such sale (but without regard to the number of days) in a newspaper in which Sheriff's sales are advertised in said County, all other notices being waived by Grantor. The Grantee may bid and purchase at such sale.

2.06 Authority to Convey. At any such public auction sale, the Grantee may execute and deliver to the purchaser a deed of conveyance of the premises or any part of the premises in fee simple with full warranties of title and to this end, the Grantor hereby constitutes and appoints the Grantee the agent and attorney in fact of the Grantor to make such sale and conveyance, and thereby to divest the Grantor of all right, title and equity that the Grantor may have in and to the premises and to vest the same in the purchaser or purchasers at such sale or sales, and all the acts and doings of said agent and attorney in fact are hereby ratified and confirmed and any recitals in said conveyance or conveyances as to facts essential to a valid sale shall be binding on the Grantor. The aforesaid power of sale and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise, are granted as cumulative of the other remedies provided by law for collection of the indebtedness secured hereby and shall not be exhausted by one exercise thereof but may be exercised until full payment of all sums secured hereby.

2.07 Application of the Proceeds of Sale. Upon any such public sale pursuant to the aforementioned power of sale and agency, the proceeds of said sale shall be applied first to payment of the expenses of such sale and of all proceedings in connection therewith, including 15% of the principal and interest due as attorney's fees, then to that portion of the indebtedness secured hereby which represents accrued unpaid interest and late charges, then to the remaining indebtedness secured hereby, and finally, the remainder, if any, shall be paid to the Grantor.

2.08 Grantor as Tenant Holding Over. In the event of any such public sale pursuant to the aforesaid power of sale and agency, the Grantor shall be deemed a tenant at sufferance and shall forthwith deliver possession to the purchaser or purchasers at such sale or be summarily dispossessed according to provisions of law applicable to tenants at sufferance.

2.09 Discontinuance of Proceedings and Restoration of the Parties. In case the Grantee shall have proceeded to

enforce any right or remedy under this indenture by receiver, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Grantee, then and in every such case the Grantor and the Grantee shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of the Grantee shall continue as if no such proceeding had been taken.

2.10 Remedies Cumulative. No right, power or remedy conferred upon or reserved by the Grantee by this indenture is intended to be exclusive of any other right, power, or remedy but each and every such right power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder or now or hereafter existing at law or in equity or by statute.

2.11 WAIVER. GRANTOR HEREBY WAIVES ANY RIGHT GRANTOR MAY HAVE UNDER THE CONSTITUTION OR THE LAWS OF THE STATE OF GEORGIA OR THE CONSTITUTION OR THE LAWS OF THE UNITED STATES OF AMERICA TO NOTICE OR TO A JUDICIAL HEARING PRIOR TO THE EXERCISE OF ANY RIGHT OR REMEDY PROVIDED BY THIS DEED TO SECURE DEBT AND SECURITY AGREEMENT TO GRANTEE AND GRANTOR WAIVES GRANTOR'S RIGHTS, IF ANY, TO SET ASIDE OR INVALIDATE ANY SALE DULY CONSUMMATED IN ACCORDANCE WITH THE PROVISIONS OF THIS DEED TO SECURE DEBT AND SECURITY AGREEMENT ON THE GROUND (IF SUCH BE THE CASE) THAT THE SALE WAS CONSUMMATED WITHOUT A PRIOR JUDICIAL HEARING, ALL WAIVERS BY GRANTOR IN THIS PARAGRAPH HAVE BEEN MADE VOLUNTARILY, INTELLIGENTLY AND KNOWINGLY, AFTER GRANTOR HAS FIRST BEEN GIVEN THE OPPORTUNITY TO CONSULT GRANTOR'S ATTORNEY WITH RESPECT TO GRANTOR'S POSSIBLE ALTERNATIVE RIGHTS. GRANTOR FURTHER WAIVES ANY AND ALL RIGHTS OF HOMESTEAD EXEMPTION IN THE PREMISES.

## ARTICLE III

3.10 Successors and Assigns Included in Parties. Whenever in this indenture one of the parties hereto is named or referred to, the heirs, legal representatives, successors and assigns of such parties shall be included and all covenants and agreements contained in this indenture by or on behalf of the Grantor and by or on behalf of the grantee shall bind and inure to the benefit of their respective heirs, legal representatives, successors and assigns, whether so expressed or not.

3.02 Headings. The headings of the sections, paragraphs and subdivisions of this indenture are for the convenience of reference only, are not to be considered a part hereto and shall not limit or otherwise affect any of the terms hereof.

3.03 Invalid Provisions to Affect No Others. If fulfillment of any provision hereof or any transaction related hereto or to the Note, at the time performance of such provisions shall be due, shall involve transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity; and if any clause or provision herein contained operates or would prospectively operate to invalidate this indenture in whole or in part, then such clause or provision only shall be held for naught, as though not herein contained, and the remainder of this indenture shall remain operative and in full force and effect.

3.04 Number and Gender. Whenever the singular or plural number, masculine or feminine or neuter gender is used herein, it shall equally include the other.

3.05 "Grantor". The term "Grantor" as used herein shall, if appropriate, include any one or more of the individual parties constituting the Grantor. Without limiting the generality of the foregoing, if the Grantor is a group of individuals, then the term "Grantor" shall include individually each member of such group of individuals, and if the Grantor is either a general or limited partnership, then the term "Grantor" shall include each general partner of such partnership.

## ARTICLE IV

4.01 Prior Deeds. In the event of a default by Grantor in observance or performance of the Grantor's or the Obligor's covenants and obligations under any one or more of the documents evidencing and securing the indebtedness secured by the deeds to secure debt (the "Prior Deeds"), if any, listed below, such default shall constitute a default hereunder and, in any such event, Grantee, at Grantee's option may without notice or demand do any one or more of the following: (a) declare immediately due and payable the Note and all other indebtedness secured hereby and proceed to exercise any and all rights and remedies available to Grantee at law or in equity or (b) make any payments or perform any acts necessary to correct any such default, or (c) pay all or part of the indebtedness secured by any one or more of the Prior Deeds. Any payments so made or costs incurred in connection with the Grantee's action pursuant to this paragraph shall be treated as though such payments were made and such costs were incurred pursuant to the provisions of paragraph 1.10 hereinabove, shall bear interest as set forth in paragraph 1.10 and shall be secured hereby, Grantor hereby assigns to Grantee all surplus funds which may, upon foreclosure, come into the hands of any one or more of the holders of the indebtedness secured by the Prior Deeds and Grantee hereby directs that said surplus funds be paid over to Grantee or the Grantee's assigns upon the debt secured by this Deed to Secure Debt and Security Agreement. Grantor will pay or cause to be paid as and when due all payments due pursuant to the terms and conditions of the promissory notes secured by the Prior Deeds.

IN WITNESS WHEREOF, this indenture has been duly executed and sealed by Grantor; any such execution and sealing by a corporation has been carried out by its proper officers thereunto duly authorized; the date and year first above written.

Signed, sealed and delivered in the presence of

_______________________________
Unofficial Witness

_______________________________
Notary Public

WILLIAM E. BRUMBY II
NOTARY PUBLIC
Cobb County

[redacted]

**GRANTOR(S):**

**1847 MEADOW LLC**

_______________________________(SEAL)
**Terrance Beasley, Manager**

_______________________________(SEAL)

# 1-4 FAMILY RIDER

## Assignment of Rents

THIS 1-4 FAMILY RIDER is made this **May 14, 2025** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **WINSTON HOLDINGS, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**1847 Meadow Lane, Decatur, GA (Fulton Co.) 30032**

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security instrument or the leasehold estate if the (Security Instrument is on a leasehold) are referred to in the 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required as stated in the Security Instrument.

E. ASSIGNMENT OF LEASES. Upon Lender's request. Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. The word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable, Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to the Lender or Lender's agents. However, Borrower shall receive the Rents until (I) Lender has given Borrower notice of default pursuant to the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes and absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (I) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument: (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to

the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the cost of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a Judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the 1-4 Family Rider.

**Borrower: 1847 MEADOW LLC**

_______________(SEAL)
**Terrance Beasley, Manager**

_______________(SEAL)
**Borrower:**

**SECURED PROPERTY:** 1847 Meadow Lane, Decatur, GA (Fulton Co.) 30032
**BORROWER/GRANTOR:** 1847 MEADOW LLC
**LENDER/GRANTEE:** WINSTON HOLDINGS, LLC
**TOTAL LOAN AMOUNT:** $50,300.00
**LOAN MATURITY DATE:** May 14, 2026

**WAIVER AND ACKNOWLEDGMENT OF BORROWER'S RIGHTS**

By execution of this paragraph, Borrower expressly: (1) Acknowledges the right to accelerate the debt and the Power of Attorney given herein to Lender to sell the premises by non-judicial foreclosure upon default by Borrower without any notice other than such notice is required to be given by law and under the provisions of the Official Code of Georgia Annotated §44-14-162.1 et. seq., (2) Waives any and all rights which Borrower may have under the Fifth and Fourteenth Amendments to the Constitution of the United States, or by reason of any other applicable law, to notice and to judicial hearing prior to the exercise by Lender of any right or remedy herein provided to Lender, except such notice as is specifically required to be provided in the Deed to Secure Debt, (3) Acknowledges that Borrower has read the Deed to Secure Debt and specifically that paragraph relating to the foreclosure provisions, and any and all questions regarding the legal effect of said deed and its provisions have been explained fully to Borrower, and Borrower has been afforded an opportunity to consult with Borrower's own independent counsel prior to executing this deed, (4) Waives any rights that Borrower may have for a homestead exemption (5) Acknowledges that all waivers of the aforesaid rights of Borrower have been made knowingly, intentionally and willingly by Borrower as part of a bargained for loan transaction; and (6) Agrees that the provisions hereof are incorporated into and made a part of the security deed.

**RESIDENTIAL MORTGAGE ACT DISCLOSURE**

O.C.G.A. SECTION 7-1-1014(3) REQUIRE THAT THE LENDER INFORM YOU THAT IF YOU FAIL TO MEET EVERY CONDITION OR TERM OF THE DOCUMENTS THAT YOU SIGN IN CONNECTION WITH OBTAINING A MORTGAGE LOAN YOU MAY LOSE THE PROPERTY THAT SERVES AS COLLATERAL FOR THE MORTGAGE LOAN THROUGH FORECLOSURE.

**BUSINESS / INVESTMENT PURPOSES ONLY**

BORROWER REPRESENTS AND WARRANTS TO THE LENDER AS FOLLOWS:

1) THAT THIS LOAN IS FOR INVESTMENT / BUSINESS PURPOSES ONLY;

2) THAT ALL OF THE LOAN PROCEEDS WILL ONLY BE USED FOR BUSINESS / INVESTMENT PURPOSES AND NOT FOR ANY PERSONAL OR CONSUMER REASONS;

3) THAT THE SUBJECT REAL ESTATE IS NOT AND WILL NOT BE OCCUPIED BY THE BORROWER AS THEIR RESIDENCE AND WILL ONLY BE USED FOR INVESTMENT / BUSINESS REAL ESTATE PURPOSES.

***Read and Agreed by Borrower:***

Signed, sealed and delivered in the presence of

M. Moore
Unofficial Witness

William E Brumby II
Notary Public

WILLIAM E. BRUMBY II
NOTARY PUBLIC
Cobb County
State of Georgia
My Commission Expires February 6, 2029

1847 MEADOW LLC

_______________(SEAL)
Terrance Beasley, Manager

_______________(SEAL)

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law states under oath as follows:

In closing above loan but prior to the execution of the Deed to Secure Debt and "Waiver of Borrower's Rights", I reviewed with and explained to the Borrower the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower of Borrower's rights under the Statutes to notice and a Judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower of Borrower's Rights. After said review with and explanation to Borrower, Borrower executed the Deed to Secure Debt and "Waiver of Borrower's Rights".

Based on said review with and explanation to the Borrower, it is my opinion that Borrower knowingly, intentionally, and willingly executed the Waiver of Borrower's Rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me
this the 14th day of May, 2025

Notary Public

Closing Attorney -

MARY M MOORE
NOTARY PUBLIC
MY COMMISSION EXPIRES MAY 30, 2028
DEKALB COUNTY, GEORGIA

2025073344 DEED BOOK 32059 PG 402
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

EXHIBIT "A"

All that tract or parcel of land lying and being in Land Lot 168 of the 15th District, DeKalb County, Georgia, being Lot 31, Glenmeadows Subdivision, as per plat recorded in Plat Book 18, Page 4, DeKalb County, Georgia records, which plat is hereby referred to and made a part hereof.

Property being known as 1847 Meadow Lane, Decatur, GA 30032

[redacted]

2026003064 DEED BOOK 32385 PG 519
Filed and Recorded: 1/13/2026 2:39:00 PM
Recording Fee: $25.00
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

Parcel ID No.: [redacted]
Recording Requested By: Residential RealEstate Review
When Recorded Return To: Residential RealEstate Review, Collateral Document Services, 3217 S. Decker Lake Drive, Salt Lake City, UT 84119

[redacted]

**CORPORATE ASSIGNMENT OF SECURITY DEED**

DeKalb, Georgia
[redacted]

Date of Assignment: JAN 06 2026
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS GRANTEE, AS NOMINEE FOR United Wholesale Mortgage, LLC, ITS SUCCESSORS AND ASSIGNS at P.O. Box 2026, FLINT, MI 48501-2026
Assignee: Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust at c/o SELECT PORTFOLIO SERVICING, INC, 3217 S. DECKER LAKE DRIVE, SALT LAKE CITY, UT 84119

Executed By: TERRANCE BEASLEY To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR United Wholesale Mortgage, LLC, ITS SUCCESSORS AND ASSIGNS
Dated: 07-06-2023 Recorded: 07-12-2023 as Instrument No. 2023079056, Book/Reel/Liber 30994, Page/Folio 795 In the County of DeKalb, State of Georgia.

[redacted]

Property Address: 1847 MEADOW LANE, DECATUR, GA 30032

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Security Deed having an original principal sum of $360,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Security Deed.

TO HAVE AND TO HOLD the said Security Deed, and the said property unto the said Assignee forever, subject to the terms contained in said Security Deed.
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS GRANTEE, AS NOMINEE FOR United Wholesale Mortgage, LLC, ITS SUCCESSORS AND ASSIGNS
On JAN 06 2026

By: [signature]
Sherry Nielsen
Assistant Secretary

(This area for corporate seal)

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. CORPORATE SEAL 1999 DELAWARE

THE FOLLOWING PERSONS HAVE WITNESSED THE EXECUTION OF THIS DOCUMENT:

WITNESS

[signature]
Sandi Widdowson

[redacted]

CORPORATE ASSIGNMENT OF SECURITY DEED Page 2 of 2

NOTARY WITNESS

STATE OF Utah
COUNTY OF Salt Lake

Subscribed and sworn to (or affirmed) before me on JAN 06 2026, by Sherry Nielsen, Assistant Secretary, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal,

Vicky Padilla

VICKY PADILLA
Notary Public State of Utah
My Commission Expires on:
February [redacted]
Comm. Numb[redacted]

[redacted]

SPS SELECT Portfolio SERVICING, inc.

**Financial Breakdown Statement**
Data date:09/10/2026 09:16:34AM
Loan Number: [redacted]

## Financial Breakdown Summary

**Borrower / Loan Information**

| | | | | | |
|---|---|---|---|---|---|
| Loan Number: | [redacted] | Loan Status: | BK7 | Interest Type: | FIXED |
| Borrower: | BEASLEY, TERRANCE | Due Date: | 08/01/2025 | Modified Date: | MM/DD/YYYY |
| Co-Borrower: | - | MI Coverage: | No | Restricted Escrow | $0.00 |
| Address: | 1847 MEADOW LANE | Acquisition Date: | 12/01/2023 | BK Case #: | 26-61372 |
| City: | DECATUR | Maturity Date: | 08/01/2053 | BK Chapter: | 07 |
| State: | GA | Stop Adv date: | MM/DD/YYYY | BK Filing Date: | 08/26/2026 |
| County: | Dekalb | Last Payment Date: | 09/30/2025 | Prepared Date: | 09/10/2026 |

**Financial Information**

| | | | |
|---|---|---|---|
| **Unpaid Principal Balance** | | | **$354,538.22** |
| | Principal Balance | $354,538.22 | |
| | Deferred Balance | $0.00 | |
| **Accrued Interest** | | | **$35,723.26** |
| | Interest From Date | 07/01/2025 | |
| | Good-thru Date | 09/10/2026 | |
| | Interest Rate | 8.50000% | |
| | Per Diem Rate | $81.69 | |
| **Escrow Advance Balance** | | | **$4,097.23** |
| | Taxes | $2,670.19 | |
| | Insurance | $1,427.04 | |
| | Escrow Refund/Disbursement | $0.00 | |
| | Mortgage Insurance | $0.00 | |
| MIP / PMI | | | **$0.00** |
| **Advance Balance** | | | **$30.00** |
| | Valuations | $0.00 | |
| | Preservation | $0.00 | |
| | Inspections | $30.00 | |
| | Postage | $0.00 | |
| | Misc. | $0.00 | |
| Late Charges | | | **$2,076.00** |
| NSF Fees | | | **$75.00** |
| Fax Fees | | | **$0.00** |
| Payoff Fees | | | **$0.00** |
| Interest on Advance | | | **$84.69** |
| Misc. | | | **$0.00** |
| Unapplied Funds | | | **$0.00** |
| **Total without Attorney fees** | | | **$396,624.40** |
| **Advance Balance - Excluded** | | | **$4,430.01** |
| | FC Fees | $3,448.75 | |
| | FC Costs | $981.26 | |
| | BK Fees | $0.00 | |
| | BK Costs | $0.00 | |
| **Total with Attorney fees** | | | **$401,054.41** |

**Foreclosure Name**

Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2024-NQM4 Trust

# Delinquency 1 - Primary Collection (DLQ1/COM2)

[redacted] QX D E L I N Q U E N C Y OWNR n/a 09/09/26 11:16:13
13 PER/CLS/OFF B/ /SP AGE: 3Y 2M IR: 8.50000 INV: QV7
DUE( 14) 46,264.60 DUE 08/01/25( )(10/10R) ASSUM: ACQ:12/01/23
LATE CHRG 2,076.00 PAYMT @ 3,317.64 P: 1847 MEADOW LANE
BAD CK FEES 75.00 L/C AMT 138.40 DECATUR GA 30032
OTHER FEES 84.69 PAYMT + LC 3,456.04 M:
TOT DUE 52,960.30* PRIN BAL 354,538.22
SUSPENSE .00 P&I 2,768.09 3781 COVINGTON HWY
NET DUE 52,960.30 DLQ 12 TIME,PAY 26 DAY DECATUR GA 30032
TERRANCE BEASLEY [redacted]

*MULTI LN*
-IMD:N--------------------- * ADDITIONAL MESSAGES * ------------------WU: P ----
ACTIVE CH 7 BANKRUPTCY *MULTI LOAN* CASHIER STOP 4
SUSPENDED FORECLOSURE PROC STOP = B BANKRUPTCY
-- Short Comments 2 ----------------------------------------------------------
DATE USR CONTACT RESPONSE REASON RECALL F/B REMIND

090326 (S6 BKRCY DOCMNT
090126 OQ8 NO DISCONNECTED
090126 OQ8 <ACCOUNT NOT DISCUSS CUST STATED HE WILL CALL BACK >
<WHEN HE NOT DRIVING >
082026 4TQ ACCT DISCUSSED

# Payoff Calculation Totals (PAY4/PG1)

**NAME** [redacted] **AS-OF 09/10/26 PAYOFF CALCULATION TOTALS 09/09/26 11:17:15**
**CONTACT NAME TERRANCE BEASLEY**

| | | | | |
|---|---|---|---|---|
| **PRINCIPAL BALANCE** | 354,538.22 | **RATE CHANGES** | | |
| **INTEREST 09/10/26** | 35,723.26 | **INT FROM** | **RATE** | **AMOUNT** |
| **PRO RATA MIP/PMI** | .00 | 07/01/25 | 8.50000 | 35,723.26 |
| **ESCROW ADVANCE** | 4,097.23 | 09/10/26 | | |
| **ESCROW BALANCE** | .00 | | | |
| **SUSPENSE BALANCE** | .00 | | | |
| **HUD BALANCE** | .00 | | | |
| **REPLACEMENT RESERVE** | .00 | | | |
| **RESTRICTED ESCROW** | .00 | | | |
| **TOTAL-FEES** | 109.69 | | | |
| **ACCUM LATE CHARGES** | 2,076.00 | | | |
| **ACCUM NSF CHARGES** | 75.00 | | | |
| **OTHER FEES DUE** | .00 | | | |
| **PENALTY INTEREST** | .00 | | | |
| **FLAT/OTHER PENALTY FEE** | .00 | **TOTAL INTEREST** | | 35,723.26 |
| **CR LIFE/ORIG FEE RBATE** | .00 | **TOTAL TO PAYOFF** | | 401,079.41 |
| **RECOVERABLE BALANCE** | 4,460.01 | **NUMBER OF COPIES: 1** | **PRESS PF1 TO PRINT** | |
| | | **TOTAL PAGE 2** | | .00 |

# Payment Change Maintenance (PCH2)

```
 [redacted]            08/01/25  PAYMENT CHANGE MAINTENANCE  09/09/26 11:16:32
T  BE[redacted]T PMT 09/01/23  INV QV7/001  TYPE CONV. RES.            MAN B
           CUR PMT 08/01/25  PB     354,538.22    IR  8.50000          GRP XSX
-----------*-> REQUEST DATE IS BEYOND ANY FUTURE SCHEDULED CHGS <-*------------
PMT DT    08/01/25           04/01/26            05/01/26           05/01/27
    IR     8.50000            8.50000             8.50000            8.50000
   P&I    2,768.09           2,768.09            2,768.09           2,768.09
COUNTY      303.64             303.64              283.59             283.59
  CITY        0.00               0.00                0.00               0.00
HAZARD      196.00             196.00              224.83             224.83
    MI        0.00               0.00                0.00               0.00
  LIEN        0.00               0.00                0.00               0.00
    OS       49.91               0.00               14.64               0.00
  MISC        0.00               0.00                0.00               0.00

   A&H        0.00               0.00                0.00               0.00
  LIFE        0.00               0.00                0.00               0.00
  REPL        0.00               0.00                0.00               0.00
   HUD        0.00               0.00                0.00               0.00
 2 P&I        0.00               0.00                0.00               0.00
   NET    3,317.64           3,267.73            3,291.15           3,276.51
PAYMNT
CHANGE
REASON
```